Now here, Cleveland v. Central States Southeast and Southwest Areas Health and Welfare Fund. May it please the court, Wade Visconti representing the plaintiffs. As the court knows, this case is here on a motion to dismiss that the district court judge granted. The standard of review, as I understand it, is de novo. And 12b-6 motions are generally disfavored and rarely granted. The strict standard of review under 12b-6 has been summarized as the question is therefore whether in the light and most favorable to the plaintiff. And with every doubt resolved in his behalf, the complaint states any valid claim for relief. Well here, unlike the usual Rule 12b-6 dismissal, the judge had, what, 1,600 pages of documents attached either to the complaint or to the motion to dismiss? It was voluminous, Judge. There's no doubt about that. There were exhibits that were attached in support of the complaint. The complaint itself was 50 pages. This was my first ERISA case. And when you get involved in ERISA cases, I'm sure the court understands the Supreme Court has created a rabbit hole that it's easy to go down, and you find yourself in Wonderland, and you're not sure exactly how you're going to get out of it. So I've tried to over-plead rather than under-plead in this particular situation. I think the court, from my perspective, should understand the timeline, which is crucial in terms of this situation, because I don't think it's your typical ERISA case where you've got a plaintiff, an insurer. They're fighting over the funds that are supposed to be set aside for whether it's a lien, which I guess would be a lien by agreement. And then they can't agree on it. It settles. The plaintiff disperses, puts it in a trust, whatever. There's variations of that throughout the case law about what happens with the money when it settles, and then can the insurance company or the insurer, self-funded insurer in that particular situation, come back and try and recoup it after the fact. And what I cited in a supplemental letter to the court after I submitted my reply brief was a case that came out, I think, either a week before or a week after, right around the same time that my reply brief came out with the Supreme Court. And what it basically said was if you've got a lien by agreement, from my perspective, the Montotil case, you've got to file suit to protect it. In fact, there was, on page seven of that decision, it said the board had an equitable lien by agreement that attached to Montotil's settlement fund when he obtained title to that fund. And the nature of the board's underlying remedy emphasized would have been equitable had it immediately sued to enforce the lien against the settlement fund then in Montotil's possession. That's how we got here today, was there was a dispute about the lien. Under 1132E, there is a provision that allows concurrent jurisdiction for suit to be filed. It makes a specific exception for an 1132A1B type of action, which is to enforce the terms of a plan. We filed suit after the lien had been asserted, after they invoked federal preemption, and we asked the court, the state court, for a decision under section 11.4 of their plan J, which says under certain circumstances, they will waive their lien. They decided they didn't want to play that game. Your client got the money that was in the state court suit, and they've given you that, and they said, but because you're messing with us, we're going to withhold all other funds to your client. So what's your argument with the state suit? I mean, it's an entirely different pot of money that they're letting you have. I'm not sure why you're saying anything they did with respect to that, since you've got to keep that money. It is a problem. It's actually not a different pot of money, Judge. And I think that's part of the reason why. Doesn't your client have that money? Yes, the money that was put into the court was, yes, my client did get that money. What I'm saying to you, Judge, is that they asserted a lien, okay? And then when the state court decided that it was going to make that decision, they chose not to participate. And what happened is that they recovered their funds that they paid to the medical providers, but they didn't recover what they paid in short-term disability benefits. They still are saying that they will recover those in the future. Let me ask, because I think there are some tricky interpretations of the plan in terms of whether they could recoup the money from the health care providers. But is that really your client's issue? In other words, does your client have standing to challenge that? I mean, it's the health care providers who got paid by the ERISA plan, and then the ERISA plan says, oh, we want to take that back. I mean, isn't that an issue between the hospital and the fund? The short answer is no. And I think that the reason there is an issue is because the basis of what they call is a recoup or reversal of benefits, if you look at their Section 11.04 of their plan, the way it's phrased, it talks about excess benefits that may be payable. I think there's at least some arguable points there. Why didn't the hospital say, well, you can't do that, you can't take this money back from us, look at this section of the plan, 11.04, but the hospital willingly gave back the money? Why is that your issue? It's not in the record because it never got that far, but there was a reference in the record of when I contacted the hospitals, they said that they were told to return the benefits on the basis that Mr. Cleveland didn't fill out a workers' compensation questionnaire. This claim never dealt with the workers' compensation claim. So from their perspective, they were required under their contract to return it because Mr. Cleveland, according to them, didn't comply with what he was supposed to do under the forms. But none of what you've just told us is part of the record, is it? No, I was just answering his question. I just want to clarify that. Sure, sure. So what you have in this particular situation is that the judge at the district court level said, I'm going to review this on an abuse of discretion standard. And it's our position that when the plan had the opportunity, because 502A3 says a plan can come in, that's what Montanillo also said, can come in and can file suit to enforce its rights under the terms of those plans. When it didn't do that, it waived the right to the common fund, the make whole, and the lien in general. But what it's still doing, this answers your earlier question, is it's still trying to take a credit in the future for part of those lien funds that it's paid out. So it had the opportunity. What it's trying to take, as I recall, the plan told him as to that, what is it, $1,800 for short-term disability? $1,820 and some change. Right. For that $1,800, we will recoup that in the future against new claims or something. That's correct. Right. It's not talking about the money your client received in the state court interpleader action. Correct? Correct. It's talking about recouping if he ever comes in and files another claim with the plan. I understand what you're saying, Judge. The crucial, I guess, point on that is that, yes, they're saying they're going to recoup it out of a future claim, but it ties back to the initial claim that we're hearing about today. Of course it does, but I'm getting back to Judge Costa's question. Your client got the $15,000 in the state court proceeding. Absolutely. They didn't contest that? They, the plan, didn't contest that? No, they didn't contest it because what they chose instead to do was reverse their benefits, and it's our perspective that when they did that, they violated the 50283 standards that had been set forth by the Supreme Court. The other point I'd like to make is that— But you're also saying there's some res judicata because of what happened in the state interpleader action, and that's why I don't understand since that's a separate pot of money that they're letting you have. I don't understand how you're saying that somehow binds what the federal court's going to do in this ERISA case. And that's exactly why—I guess I haven't made myself clear. All right. From my perspective, the state court suit that was filed, that was filed under the 1132E concurrent jurisdiction, which allows for the plans of the term to be interpreted under 1132A1B, all right? I got that judgment. But while I got that judgment for my client, they reversed benefits after that state court suit was filed. I could not, without facing a failure to exhaust administrative remedies, file suit at that point. I had to go through that process of saying, guys, you can't do this. You can't ignore the state court and just say I'm going to take— Wait a minute. Let's get our timeline right because I think it's important. In early 2014, you contacted Central and you contended any subrogation lien was illegal. That was as to that $5,000 shelter paid Central. And then 16 January, Central sent a letter to Cleveland reasserting its subrogation rights and the potential breach of the plan and possible recruitment. And then you sued Central and Citadel on 21 January. Then 11 February, Central recouped the benefits. That's right. When you filed that action, you knew that Central was going to attempt to recoup those benefits. Okay. This isn't something that happened after you filed the action. You filed the action because you knew they were going to attempt to recoup the benefits. Absolutely, Jeff. Well, I misunderstood what you were saying. No, I invoked my client's due process rights. Absolutely, that's what I did. Where I was going to go with it was I said that I had to go through that administrative process and the claims that are made in the federal case are we are trying to redress what we consider to be a violation when they recoup that money. So it was not an A1B action anymore. It was an A3 action, which provides that you may redress violations. We'd already had the interpretation of the plan. They ignored it. So in this particular situation, what we are dealing with is an A3, go back, you have to pay these benefits back to the providers because this section that they're relying on, 11.04, again provides with excess benefits. This was not an excess benefits case. This was not a situation where doctors were paid more or some other party was paid more than they were owed under the terms of the plan. I'll reserve the rest of my time for rebuttal. Yes, you've saved time for rebuttal. Thank you, Mr. Visconti. Mr. Herring? Good morning, Your Honors, and may it please the Court. I would like to address a few points raised in Mr. Visconti's initial comments. First of all, he said that this isn't a typical ERISA case. It's our contention that it is a typical ERISA case. This is the kind of benefits case that this Court sees all the time. This is a case in which, quite simply, there is a benefits denial and we're under the abuse of discretion. Benefits what? That there was a benefits denial. Denial. Yes. So we're under the abuse of discretion standard. This is a typical case before this Court, and the fact that Mr. Visconti and his client have chosen to throw in a bunch of other claims, all of which were dismissed as completely unviable, doesn't change the matter that this is a simple ERISA benefits case. And I think given that it's a simple ERISA benefits case, as this Court knows, the abuse of discretion standard applies. And that's because Section 8.03 of the Funds Plan gives the Fund, excuse me, the Board, authority to interpret the terms of the Funds Plan. And under the abuse of discretion standard, obviously there's two elements here. There's whether or not plaintiffs have shown that the Board's decision was legally incorrect and whether or not they've shown on top of that that it's an abuse of discretion. And I think here there's a couple things right off the bat that indicate that the decision was legally correct under the plan. First of all, there's Section 11.14a of the plan, which clearly gives the Fund, and I'm paraphrasing here, but it provides that whenever the Fund makes payments relating to a certain accident, the Fund is then granted subrogation rights immediately to the full extent of those payments. And that's what happened here, and I don't think there's any dispute. Mr. Cleveland suffered an accident in October 2013. After that, the Fund paid him benefits, and then pursuant to that the Fund immediately under Section 11.14a got subrogation rights. So there's no dispute the Fund had subrogation rights. Second, there's also no dispute that Mr. Cleveland violated the terms of the plan. Section 11.14b of the plan provides, quote, the covered individual shall fully cooperate with the Fund in enforcement of the Fund's subrogation rights, and also, quote, shall refrain from any act or omission that would to any extent prejudice or impair the Fund's subrogation rights. Then Section 11.14d provides no covered individual, including his attorneys and other representatives, is authorized to release or impair the Fund's subrogation rights to any extent. Clearly here there was a violation of the plan. First of all, the correspondence that was addressed earlier, Mr. Visconti saying that on behalf of Mr. Cleveland that the Fund's lien was illegal and that he would basically do everything in his power to prevent the Fund from recouping that lien. That's a clear violation of the plan. On top of that, we have other correspondence in a similar vein on the same day, January 9, 2014, and we also had the filing of a state court litigation in which Mr. Visconti sought to declare the Fund's lien invalid as it applied to the $15,000 that we've been talking about. So that's the second point. There's absolutely no doubt that Mr. Cleveland violated the plan. As Judge Costa acknowledged, there's also a third point, and the third point is that the Fund had authority under the terms of the plan to recoup the benefits. And I know Judge Costa maybe previewed this issue a little and at least asked who would agree whether or not the Fund did have that authority, and the clear answer is yes. First of all, there's Section 11.04 of the plan which provides that, and I'm paraphrasing here, or I can get the exact quote actually because this is very important to get the exact quote here. When benefit payments exceed the amount of the benefits payable under the terms, the Fund shall have the right to recover the excess payments from any responsible persons or entities. Exactly, Your Honor. And I think he was highlighting the exceeding the amount of benefits payable language. I guess my bigger concern with your position is the responsible parties. Right. That makes sense. So if Medicare is paying another responsible party, another insurance company is paying, that to me is the classic other responsible party that you try to invoke that provision against. Is it a health care provider? Why is it a responsible party? Well, if you turn to Section 11.14H of the plan, that provides that any person, entity, or responsible person, quote, includes any person or entity that, quote, the Fund claims to be responsible in whole or in part to provide payment or compensation or reimbursement to the Fund of the unrecovered amount. And here, that's exactly what the Fund claimed as to the medical providers. They claimed that because Mr. Visconti violated the terms of the plan, all the benefit payments the Fund had made to those providers were not payable under the terms of the plan, and thus the medical providers were required to, as this section says, to provide payment or compensation to the Fund of the unrecovered amount. So I don't necessarily think, and I don't think the Board would say, that responsible persons is limited to medical providers, but in this case they were clearly responsible persons under the terms of the plan. And I think that's 100% clear and there's no ambiguity. But even if there's any ambiguity as to this, the second part of the test requires plaintiffs to show that it was an abuse of discretion. And this Court's made clear multiple times, the most recent case I can think of is McCorkle, in which the Court said that it's not, reasonableness is not a black and white thing. It's a continuum of reasonableness. And as long as the Board makes a decision that's on any part of that continuum, the decision is proper and they didn't abuse their discretion. There's also other cases, such as Shedrick v. Marriott, in which this Court held that if there's any concrete evidence to support the decision, it's not an abuse of discretion. And I think here, even if there's ambiguity as to 11.14h, including responsible persons as medical providers, I don't think there's any potential evenly close to viable argument that the fund abuses discretion in interpreting the plan that way. I would also note that there's also section 11.14e, and I've addressed that in the brief. I believe that, and the Board believes, that that also provided an independently sufficient basis on which to recoup the benefits. Doesn't that contemplate filing a suit, a subrogation suit, to get the benefits back? I think that's part of what it contemplates, but I don't think the language is limited to that. Because 11.14e basically provides that when someone violates the plan or receives funds in satisfaction of their subrogation rights, E-1 provides that the fund has the right at any time to decline to make any payment for any benefits on behalf of the covered individual. So I think that that also provides an independent basis here for the fund to recoup. But even if it doesn't, it's not an abuse of discretion to interpret that it does. Is there anything in the record in which, after the plan paid $10,400 for medical benefits and roughly $1,800 for temporary disability, is there anything in the record where the plan participant says that's not enough, you didn't pay me, the amount you paid me is not fair? No, and I don't think that's plaintiff's contention in this matter. I know it's not. I don't think there's anything in the record to support that. So I think that's the core of this issue. This is a benefits case, and I think, first of all, the fund's decision was clearly legally correct. But even if it wasn't, plaintiffs have not stated a viable claim that the fund abuses discretion. Now, I'd like to move beyond the abuse of discretion issue, the McCorkle standard, and kind of address what I think is at least an implication contained in the correspondence and in the briefs from Mr. Visconti, and that implication is that the fund has somehow been unreasonable or inequitable in this matter. I'm here to say that nothing can be farther from the truth. If you look at the record, and I'd usually be leery to discuss settlement offers and things like that, but all these things I'm going to talk about are in the record, and if you look at the record, the fund has consistently made reasonable and fair offers of settlement to Mr. Visconti before it recouped the benefits and after it recouped the benefits. But Mr. Visconti has rejected those offers, not because of any consideration of his client's interest, but because of his stubborn reliance on the false principle that Louisiana attorney's fees law somehow applies to this case. We first made a settlement offer on February 5, 2014, before we recouped, and that offer was for one-third of the $20,000 that Mr. Cleveland had recovered to date. However, Mr. Visconti rejected that offer. Then, after we recouped, the fund again extended an olive branch to Mr. Visconti and again offered to settle for one-third of the $20,000 that Mr. Cleveland had recovered. And because the fund had recouped, we also offered to reprocess all of the medical payments that we had paid so that Mr. Cleveland would not be left holding the bag. In addition to that, we also explained in our June 5, 2014, email that the funds offer was actually better for Mr. Visconti's client than the offer that Mr. Visconti had consistently been making. And that offer that Mr. Visconti had consistently been making was that Mr. Visconti would take three-fourths of the fund's lien and the fund would take the remaining one-quarter. Yet, Mr. Visconti again rejected our settlement offer because he believes, with no basis in the law, that Louisiana attorney's fees formula should apply to this case. And after he rejected that in June, we again responded to him by citing controlling Supreme Court precedent, stating that Louisiana attorney's fees law does not apply to this case. However, instead of simply saying, oh, you're right, Mr. Visconti rejected the offer again, asserting, with no basis or citation otherwise, that ERISA somehow violated his constitutional rights to his attorney's fees. Ironically, the whole time, the whole point of the fund's formula was that the fund would take one-third of the $20,000, Mr. Visconti's client would take one-third, and Mr. Visconti could get attorney's fees for one-third. But Mr. Visconti was so blinded by his belief that Louisiana attorney's fees formula should apply that he was not able to see through that and settle this case that should have been settled long ago. Now, when you're talking about $20,000, you're talking about the $5,000 Shelter paid Central, and then the $15,000 that – what's the name? Citadel. Citadel paid Mr. Cleveland. That's correct, Your Honor. So basically, by inexplicably adhering to the false idea that Louisiana attorney's fees law applies to this case, Mr. Visconti has now wasted two federal courts' time or the time of two federal courts and the fund's time by making this literally into a federal case when it should have settled long ago. And all this could have been avoided if Mr. Visconti would have just simply acknowledged binding Supreme Court precedent, providing that Louisiana attorney's fees law does not apply to this case. So to circle back to my initial point, this is a benefits case, Your Honors, and this case basically boils down to determining whether or not the board abuses discretion. And Mr. Visconti and Mr. Cleveland simply have not been able to state a viable claim that the board did so. So? As we've talked about, there's really two determinations he's challenging. One is the determination just that his client's not going to get any money going forward because he interfered with the subrogation rights. Right. The second one is challenging the recoupment that you all obtained from the medical providers. Do you think that second issue, the recoupment issue, is something that Mr. Cleveland can challenge, or is that just an issue between the medical provider and your client? You know, we didn't address the standing issue in our briefs. I think, as you point out, there is a strong argument that Mr. Cleveland doesn't have standing. And I think... Mr. Cleveland or Mr. Visconti? Well, certainly Mr. Visconti doesn't have standing, and Mr. Visconti doesn't have standing to bring any suit in this action because Section 1132 limits the people who can sue to participants and beneficiaries. Mr. Visconti is neither of those. It's a little more debatable as to whether or not Mr. Cleveland has standing to sue, but I would say no, he doesn't have standing. I mean, this is basically an issue between the medical providers and between the fund. Although it leaves him with a bill. It leaves him with a bill, but again, I would say that Mr. Visconti and Mr. Cleveland have not established their standing under that. And, in fact, they brought all their claims in that vein under Section 1132A3 of ERISA, which provides that basically, and I'm paraphrasing here, parties can bring claims for equitable relief that's not covered by the other provisions. And this Court has made clear that Section 1132A3 claims for benefit seniles are not viable, and that's cases such as Tolson v. Avondale Industries and Rohrer v. Raytheon Engineers. So I would say for both of those reasons, Mr. Cleveland also does not have standing to bring the suit. And if you're right in the first determination that because there was a violation of the subrogation rights that Mr. Cleveland has no entitlement to anything from the fund. I guess I don't even know if it's a standing, but if he has no entitlement to funds because of that first decision, Assuming that the recoupment wasn't supported by anything in the plan, does he have any basis for complaining when there's a determination that he's not entitled to anything anyway? Right, and we would say no. I mean, obviously, I would disagree respectfully. And I know it's just an assumption, but the assumption that there's no basis in the plan. But yeah, I mean, I would agree with that. He would not have a basis to recover because, again, the dispute between Mr. Visconti and Mr. Cleveland on one hand and the fund on the other hand is over. The fund recouped. So I would agree with that. All right. Thank you. Thank you. You've saved time for rebuttal. Let me start with the last question you asked him in his response, Your Honor. You asked about the standing issue, and the short answer is he's right. I don't have standing under ERISA. The actions that were filed as far as my law firm were done under the DJA Act, the Federal Declaratory Judgment Act. So it's not an ERISA claim that's being made. But as far as standing under the ERISA that we're talking about, the terms of the plan that they're invoking, if you look at A1B of 1132, it says that a beneficiary may bring suit to recover benefits or to enforce rights under the terms of the plan or to clarify rights to future benefits. So what we're talking about here is either the recovery of the benefits because of a breach of fiduciary duty, because it's restitution that he's seeking for payments that have been made to the doctors now that there's been a recoupment by the fund, or alternatively, this court could render a decision where it said, fine, you've got to go pay the doctors again. So it's either to recover the benefits or to enforce the terms of the plan, which they'd already done, which they'd already done once, to pay the doctors what they contractually agreed to pay. As far as the abuse of discretion standard, that's one of the things they're saying, hey, look, we've got abuse of discretion, you've got to give us the benefit of the doubt. No, you don't, because their own plan, Article 10 of their plan, says that they have certain guidelines, and the Code of Federal Regulations says that they have certain guidelines that are procedural safeguards, I think is the terminology that's used, that are designed to ensure that a beneficiary gets a fair shake in terms of a benefits claim. And that's one of the issues that we raised, which we said, hey, we asked for your own plan provides Article 10. You keep minutes. You identify who's there. We want to see the records. We want to make sure that we got a fair shake. They said, nope, it's privilege. You don't get that. The law is clear. It's not privilege. And so the issue is we asked for discovery on that basis. That was one of the claims we made under this court's Crosby v. Health Risk, I think is the case. I could be wrong on that. But essentially what we asked for was we said, all right, they're saying that they didn't abuse their discretion, but they've got their own plan terms that they're invoking. Let us confirm that, cut the cards, make sure that we're not getting anything dealt from the bottom of the deck. If you look at their real, they parse words when they quote their plan. 1114B, that they talk about the impairment or the prejudice of rights. If the court will look at that particular section, what it says is, the covered individual shall, upon request by a fund representative, execute whatever documents are appropriate to enforce and preserve the fund's subrogation rights, shall perform whatever acts are requested by the fund representative to enable the fund to effectively prosecute a civil action in the name of the covered individual. So he did that. He offered to give them whatever subrogation rights they wanted to hire their own attorney. More importantly, if this court goes back to its decision back in 2014, the central states versus health special risk case, which I cited, this court basically, as I understand it, said this provision right here is a violation of ERISA because it's seeking money damages. And that's what they did. They went and they got the $5,000 from the MedPay, and then they turned around and they paid it back to me because I told them. I said, guys, you can't do that. Let me ask you, you just have a minute left. On this preemption issue, you filed suit in federal court. As you've said, you've brought claims under ERISA. Are you bringing separate state law claims that are preempted, or are you just arguing that Louisiana law governs your ERISA cause of action? No. We are not saying that Louisiana law governs your ERISA. Why is there a preemption? Did you bring state law claims in federal court? I didn't see it in the complaint. No, Your Honor, we didn't. Why is there a preemption issue? I mean, the district court decided it, but I don't quite see where. Why is it an issue if you didn't bring state law claims? The only reason I think it's an issue is because they're saying that it's an ERISA case in terms of the standard of review that the court— Well, you're saying it's an ERISA case if you filed in federal court citing ERISA. I do agree with that, and that's why I cited the Derringer case. I said that we're allowed to seek redress of the violations that occurred in this particular case, but them saying that an abuse of standard discretion, they waived that right because they had to raise that at the state court level when they were given notice. Does that answer your question? Maybe. All right, thank you, Mr. County Attorney. I appreciate the court's time. Your case is under submission. Thank you.